[861 NYS2d 288]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAMON VALDEZ, Appellant.

First Department, June 17, 2008

APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Daniel A. Warshawsky* and *Caryn L. Trombino* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Michael J. Balch* and *Sylvia Wertheimer* of counsel), for respondent.

### OPINION OF THE COURT

LIPPMAN, P.J.

The original jury in this single witness identification case was unable to reach a verdict upon the count of the indictment charging defendant with grand larceny in the fourth degree (Penal Law § 155.30 [5]). At the retrial of that count, the prosecutor, immediately after her witness had been sworn and before he had provided any testimony probative of defendant's commission of the charged offense, elicited from the witness that he had, before joining the police force, served as a paratrooper in the Army; that he had subsequently obtained a Bachelor of Science degree in economics and international finance; that he had during his time as a police officer risen to the level of lieutenant and had been awarded 47 commendations, prominent among them the Department's Medal of Valor, which he received for having been shot in the line of duty; that of the 41,000 officers in the Police Department he had been chosen, not once, but twice, as the sole annual recipient of the "Cop of The Year" award; and that he had nearly completed a Master's degree in history.

Although it is plain that this recitation, portraying the prosecution's fact witness, undoubtedly accurately, as a person of extraordinary attainment, uncommon valor and sterling

character, was not properly placed before the jury, particularly at the trial's very outset when no issue as to the witness's character or capacity for truthfulness had been, or, indeed, could have been raised, the error was the subject only of general objections and accordingly is not preserved for our review as a matter of law (*see People v Tevaha*, 84 NY2d 879 [1994]). Yet, while we ultimately decline to invoke our interest of justice jurisdiction to afford defendant relief, the error merits more than perfunctory address, not simply because it was pronounced, evidently the product of a strategic election in the aftermath of the first trial, and risked the fairness of the proceeding (albeit in the end not irretrievably), but also because the practice of adducing evidence of "background" prematurely to buttress a witness's credibility is not uncommon and it is not difficult to envision a case, not too different from the one at bar, in which commission of this kind of error would require reversal.

■ It is a basic principle of the law of evidence that a witness's credibility may not be propped or bolstered unless the witness has first been impeached (*see* 1 McCormick on Evidence § 47 [6th ed 2006] ["one general principle, recognized under both case law and the Federal Rules of Evidence, is that absent an attack upon credibility, no bolstering evidence is allowed"]; *see also* Prince, Richardson on Evidence § 6-502 [Farrell 11th ed]; Fisch, New York Evidence § 491 [2d ed]). "The rationale is that we do not want to devote court time to the witness's credibility and run the risk of distracting the jury from the historical merits unless and until the opposing attorney attacks the witness's credibility" (McCormick § 47).

While the elicitation of some "background" information to provide context for the testimony of the People's witness would have been permissible, "[i]n New York, in general, accreditation of a witness in advance of impeachment is disallowed," and "[a] witness' good character for truthfulness may not be proven in the absence of an attack on such character" (Barker and Alexander, Evidence in New York State and Federal Courts §§ 6:36, 6:37 [5 West's NY Prac Series 2001]). Here, the prosecutor, in advance of any other testimony, drew from her lay fact witness a curriculum vitae that would naturally have encouraged a reasonable juror to conclude that the witness was a person of unimpeachable character and, by easy if not sound inference, a highly credible historian of the events in issue. This was not a mere technical divergence from the proper order of proof.

The theory of the defense was not that the People's witness lied, much less that his capacity for truth telling was deficient.

It was rather that the witness had been mistaken—that he had not been situated so as to accurately observe and comprehend the conduct at issue, which, according to his own testimony, at its outset, unfolded rapidly some two blocks away from him on the diagonally opposite sidewalk, in a location that may well have been only intermittently visible to him given the likely intervening presence of weekday morning pedestrian and vehicular traffic. The defense cross-examination was entirely consistent with this theory and did not seek to impugn the officer's basic honesty (cf. People v Grady, 40 AD3d 1368, 1373 [2007], lv denied 9 NY3d 923 [2007] [any error in permitting a police witness prematurely to "bolster his own credibility with evidence of good character" was mitigated by the circumstance that the officer's credibility was subsequently "vociferously" attacked]). And, although it is true that defendant's attorney suggested in summation that the People's witness had persisted in an accusation of which he was uncertain to protect his reputation, it is only fair to observe that this suggestion would not and could not have been made had the evidence of the officer's reputation not been gratuitously injected into the case by the prosecution. Defendant denied the theft and gave testimony which at points conflicted with that of his accuser, but "the mere contradiction of the witness . . . [does not] authorize the admission of evidence of good reputation" (Prince, Richardson on Evidence § 6-502 [Farrell 11th ed]). Indeed, were the threshold for the admission of evidence of character so low, trials would be routinely mired in collateral inquiries.

We cannot agree with the People's appellate contention that the testimony respecting their witness's background and achievements was admissible because it was relevant, since education and experience "affect" the reliability and accuracy of a person's observations. Even if the testimony had been relevant, it would not therefore have been admissible. Whether one characterizes the disputed evidence as evidence of character or education and experience, its conceded purpose was to enhance or bolster the witness's credibility, and, as noted, bolstering is not permitted unless and until the witness has been impeached. Even then, it is closely circumscribed; it must bear some reasonable relation to the impeachment. A witness's life experience does not become admissible simply because the accuracy of his observation on one occasion has been called into question or because his account has in some respects been contradicted. Moreover, while education and experience may "affect" a

person's powers of observation, it is not by any means clear what significance should reasonably attach to such factors. Certainly, there appears no reason to suppose that an accumulation of advanced degrees will render one a more reliable observer or relator of street crime. Nor is there reason to suppose that one's opportunity accurately to observe a particular transaction will be improved by a valorous history. When all is said and done, the People's witness was called not as an expert but as a fact witness and his testimony in that capacity was not properly heralded by his resume. In its mimicry of a recital of expert qualifications and in its luminous yet largely irrelevant content, the "background" testimony was distracting and potentially misleading. Nonetheless, however strongly we may disapprove of the introduction of such a hazard into this case, a close review of the record leaves us unable to conclude that the potential for prejudice was ultimately realized so as to deprive defendant of a fair adjudication.

While, as noted, the accuracy of the prosecution witness's account of the larceny itself might be questioned, since it occurred at a distance of nearly two blocks and at a point that may well have been at least intermittently obscured from his view, the record discloses no ground to doubt the accuracy of the witness's account of the immediately ensuing events in which the occurrence of the larceny was confirmed and its perpetrator brought within easy observational range. The officer testified that in the immediate aftermath of what he had from his vantage point taken to be a theft of a pedestrian's shoulder bag, the individual he had supposed to be the thief, a tall man with salt-and-pepper hair, came running in his direction, pursued by the individual he had supposed to be the shoulder bag's rightful owner, a much smaller, slight man with dark hair. The larger man, as he ran, clutched the shoulder bag that the officer believed he had seen taken from the smaller man, and as the two men rapidly closed the distance between themselves and the officer, the officer could hear the smaller man yelling for the larger man to stop. Just as the two men reached the corner diagonally opposite the officer's vantage point, the officer observed the larger man, now no more than 25 feet away, throw the bag to the ground. The smaller man immediately retrieved the bag, and the larger man continued running, crossing the intersection of 181st Street and Fort Washington Avenue and then turning east on 180th Street. The officer testified that he followed the larger man, first in his car and later on foot, continuously from the intersection of

181st Street and Fort Washington Avenue until the man's eventual apprehension on 180th Street near Wadsworth Avenue, losing sight of him only briefly. The apprehended individual was defendant.

Plainly, the jury's decision to credit this essentially unchallenged account of the larceny's immediate aftermath is not plausibly understood as having been actuated by the objectionable testimony. Had there been some reason, apart from defendant's bare denial of the theft, to doubt the accuracy and reliability of the observations upon which the officer's inculpatory testimony was based, our conclusion as to whether the bolstering testimony had ultimately proved benign might well be different. If, for example, the entire proof of the larceny had consisted of the officer's observation at a distance of two blocks of what he thought had been a taking by defendant, it would not be possible to conclude with similar confidence that the jury's decision to credit the officer's testimony had not been attributable to the testimony having been bolstered. Here, however, the completely unimpeached testimony respecting the officer's close observation of the events stemming from and circumstantially confirming in the most unambiguous way both the larceny and defendant's role as its perpetrator affords us no ground to infer that the jury, in crediting the officer's account of the theft, made a determination that it would not have made had the objectionable testimony been kept from it.

■ From what has been said, it should be clear that we, upon our own review of the record, perceive no basis to conclude, as defendant contends, that the evidence was misweighed by the jury (*see People v Bleakley*, 69 NY2d 490, 495 [1987]). Nor do we find merit in defendant's remaining contention, that his challenge for cause to a juror whose grandfather had been a police officer and who admitted "an emotional regard" for police officers should have been granted. When questioned by the trial court as to whether she could be fair despite her strong feelings for her grandfather, the juror replied that she could, and on this record we cannot say that the court erred in crediting her response and finding it a sufficiently unequivocal declaration of impartiality (*see People v Shulman*, 6 NY3d 1, 27 [2005], *cert denied* 547 US 1043 [2006]).

Accordingly, the judgment of the Supreme Court, New York County (Charles H. Solomon, J.), rendered May 8, 2001, convicting defendant, after a jury trial, of grand larceny in the fourth degree, and sentencing him, as a second felony offender, to a term of 2 to 4 years, should be affirmed.

ANDRIAS, J. (concurring). While I agree that defendant's conviction should be affirmed and that his present "bolstering" claim is unpreserved for review due to the lack of proper objection to the prosecutor's purportedly unduly lengthy introduction of Lieutenant DeStefano, the People's principal witness, I cannot agree that anything untoward occurred here. Nor do I agree that the lieutenant's testimony about his background and accomplishments was irrelevant, distracting, potentially misleading, or a collateral issue gratuitously injected into the case by the prosecution.

Here, there was no bolstering as that term is generally understood, and certainly no prejudice to defendant. Rather, the prosecutor began her direct examination of Lieutenant DeStefano, as she did without objection at the first trial, by accrediting her witness, as all good trial lawyers are trained to do (*see e.g.* Mauet, Trial Techniques § 5.2, at 96-100 [6th ed 2002]). Since jurors know nothing about a witness beforehand, introductory questions are useful because they let the jurors know what to expect. Thus, whenever a witness takes the stand for the first time, counsel's first order of business on direct examination is to let the jury know who the witness is, why the witness is there, and why the witness should be believed. The jurors want to know a little bit about the witness so that they have an initial basis for assessing credibility. "Simple background questions should be asked of all witnesses, because credibility is always an issue" (Mauet at 100). Thus, without violating the character evidence rules, counsel can elicit background facts that create a favorable impression of the witness (Carlson and Imwinkelried, Dynamics of Trial Practice: Problems and Materials, at 176 [2d ed 1995]).

Whether the background should be developed further depends on who the witness is and how important the witness's testimony is. In New York, the general rule is that all relevant evidence is admissible; however, even if technically relevant, testimony may still be excluded "if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury" (*People v Scarola*, 71 NY2d 769, 777 [1988]). As with all testimony, it is up to the trial court, in the exercise of its discretion, to determine issues of relevancy, and there is no indication that such discretion was improvidently exercised here. Significantly, defense counsel never articulated a reason why such questions were objectionable, and after she specifically objected on grounds of relevancy, the court, although overruling the objection after the prosecutor

said it was her last background question, directed the prosecutor to move on.

Any attempt to characterize the central issue in this case as merely one of perception or accuracy of the arresting officer's observations misses the point. The jury was presented with diametrically opposing versions of events. Defendant testified that he came to the neighborhood to look for work; that he decided to jog around a nearby park; and that he was simply running down the street to a smoke shop to buy cigarettes when he was accosted for no apparent reason by the off-duty lieutenant, who, after a bizarre conversation, ordered defendant arrested for bag snatching. The lieutenant, on the other hand, testified that he was off duty and was stopped at a traffic light when he saw defendant snatch a bag from an unidentified man about a block and a half away; that he then saw the victim chase defendant down the street right in front of the lieutenant's car; that defendant dropped the bag and continued running, whereupon the victim picked up the bag and walked off, never to be found again; that he took up the chase and eventually wrestled defendant to the ground before he was placed under arrest by police officers who responded to the lieutenant's 911 call. Plainly and simply, this trial was all about credibility. As noted by my learned colleagues, defense counsel conceded as much in her summation by implicitly, albeit not directly, attacking the lieutenant's credibility, when she suggested that he persisted in an accusation of which he was uncertain in order to protect his reputation in his precinct.

As in *People v Grady* (40 AD3d 1368, 1373 [2007], *lv denied* 9 NY3d 923 [2007]), where the defendant contended that the People should not have been permitted to bolster the credibility of one of the arresting officers by eliciting from him testimony concerning past acts of heroism and his receipt of commendations, the lieutenant's testimony here was brief, consisting of three pages out of a total of 62 pages of testimony, did not constitute hearsay, and was not improperly exploited in the prosecutor's summation. Indeed, it was defense counsel who twice referred to the lieutenant's background in summation as a reason to discredit his testimony. Finally, the court gave the jury the standard instruction that the lieutenant's testimony was to be given no more credence than that of any other witness simply because he was a police officer.

Since the jury was charged with having to decide which of two starkly contrasting stories to credit, it was not inappropri-

ate for the prosecutor to present her witness in the best light. Likewise, once defendant chose to testify in his own defense, it was appropriate for defense counsel to present him in the best possible light. Defendant's present argument is a curious twist of the *Sandoval* concept in that he seeks not to limit the prosecutor's questioning *of him* regarding his prior criminal background, but proposes to restrict the jury's ability to evaluate the officer's credibility. This is standing the concept of "prejudice" on its head.

Mazzarelli and Sweeny, JJ., concur with Lippman, P.J.; Andrias and Buckley, JJ., concur in a separate opinion by Andrias, J.

Judgment, Supreme Court, New York County, rendered May 8, 2001, affirmed.